OPINION
{¶ 1} Defendant-appellant, Juan L. Smith ("appellant"), appeals the judgments of the Franklin County Court of Common Pleas, which convicted him of assault, having a weapon while under disability, and two counts of aggravated robbery with a merged firearm specification. For the following reasons, we affirm. *Page 2 
 {¶ 2} In common pleas case No. 07CR01-100, the Franklin County Grand Jury indicted appellant on two counts of aggravated robbery and four counts of robbery. These counts contained firearm specifications and stemmed from an incident at Nabby's Carryout ("carryout"). One aggravated robbery count and related robberies pertained to the carryout and its staff, and the other aggravated robbery count and related robberies pertained to Ray McNeal, a customer at the carryout. In this same case, the grand jury indicted appellant for fourth-degree felony assault on Columbus Police Officer Charles Distelhorst and for having a weapon while under disability. In common pleas case No. 08CR05-3704, the grand jury re-indicted appellant on the robbery counts to conform withState v. Colon, 118 Ohio St.3d 26, 2008-Ohio-1624. Plaintiff-appellee, the state of Ohio ("appellee"), did not seek dismissal of the original robbery counts.
 {¶ 3} Appellant pleaded not guilty and exercised his right to a jury trial on all counts except the having a weapon while under disability. For that count, appellant requested that the trial court decide whether the evidence established his guilt. The court joined the two indictments in case Nos. 07CR01-100 and 08CR05-3704 for trial.
 {¶ 4} Carryout owner Susanna Qabie testified as follows for appellee. On December 23, 2006, at 11:15 p.m., Qabie was at the carryout behind the cash register counter with employee Mohammed Omar. A man came in the carryout with his back to the counter and spun around. He was wearing a large dark coat with a fur trimmed hood. The coat and hood had orange lining. The man wore a black rag to cover his face, and a hat held the rag over the man's face. The hat fell off when the man pulled up the jacket's hood and landed on a potato chip rack. The man pointed a black *Page 3 
handgun at Omar. The gun had a "red light that bounced off of Mr. Omar's chest." (Vol. I Tr. 38.) The man demanded the cash register. Omar gave the man the cash register drawer, but Omar took out the checks. The man took the drawer and the checks. The man also "robbed" McNeal. (Vol. I Tr. 38.)
 {¶ 5} The police asked Qabie to identify in a photo array the person who committed the crimes at the carryout. Qabie identified appellant in the photo array, and Qabie included a statement that said she identified appellant through his voice. Qabie recognized appellant's voice because he had been at the carryout at least a "couple of dozen" times. (Vol. I Tr. 35.) Qabie was also familiar with appellant because he had had an altercation at the carryout. Also, the man who committed the crimes at the carryout had tattoos on his hands, and Qabie had previously seen the tattoos on appellant's hands. The tattoos were distinct; one hand had letters, and the other hand had numbers. Qabie had not seen many people with tattoos on their hands.
 {¶ 6} On cross-examination, Qabie testified that, 15 to 20 minutes before the crimes at the carryout, a man with a pit bull was in the store. This man eventually left the store, and this man was different than the man who committed the crimes at the carryout. Qabie thought that the man with the pit bull "was in association" with appellant. (Vol. I Tr. 67.) The cash register with the stolen drawer "rang up a little over 2,000 dollars." (Vol. I Tr. 78.) Qabie also gave details about the theft against McNeal. Qabie said: "I had [McNeal's] money that he gave me to buy his Long Island Ice Tea. * * * I had already handed him his change back. [McNeal] had his wallet out. And he was trying to put his change that I had handed him back in his wallet at the same time *Page 4 
that [appellant] had come in and decided to rob us." (Vol. I Tr. 61-62.) Qabie specified that she gave McNeal $2.50 in change from $5.
 {¶ 7} McNeal testified as follows for appellee. McNeal was previously convicted of carrying a concealed weapon and receiving stolen property. McNeal knew appellant from the neighborhood, and they were previously friends. Before McNeal entered the carryout on the evening of December 23, 2006, he saw appellant in a parking lot talking to a man with a pit bull. Both men said that they needed money. Appellant was wearing jeans, a black shirt, and a black jacket. The jacket did not have orange coloring. Appellant also had a black rag on his hair. McNeal did not notice whether the individual had hand tattoos, and McNeal said that hand tattoos were common.
 {¶ 8} When McNeal approached the carryout counter to make his purchase, appellant entered with the rag covering his face. Appellant had a gun with an orange mark at the tip. McNeal did not notice a laser on the gun. Appellee showed McNeal Exhibit 20, which was a gun. McNeal said that this gun had an orange mark just like the gun appellant used at the carryout.
 {¶ 9} McNeal thought that Qabie started to give appellant money, but McNeal emphasized that during the incident, he "just blacked out. I was just really trying to get it over with." (Vol. II Tr. 18.) McNeal remembered that appellant pointed the gun at him, however, and that appellant took a $50 bill from his hand. This was the only money McNeal had that night, and McNeal had not yet given Qabie any money. Appellant took McNeal's money and the carryout cash register drawer. A white hat dropped out of appellant's pocket and into a potato chip rack. Early in the morning after the carryout *Page 5 
incident, the police showed McNeal a man outside a police car. McNeal told police that the man was appellant and that appellant committed the crimes at the carryout. Appellant was wearing a different shirt and no jacket.
 {¶ 10} Tamisha Backner was another customer at the carryout and testified as follows for appellee. Outside the carryout, Backner saw two men; one had a pit bull. Backner went in the carryout to make a purchase. Afterward, she exited the carryout, but immediately went back for another purchase. When Backner went back into the carryout, she saw one of the men from outside, now masked, with a gun, robbing the store. She instantly left and saw the man flee with the cash drawer. The man was wearing a black coat with orange lining and fur around the hood. The man also had a white hat when he was in the carryout, but he did not have the hat when he fled. Backner cannot identify this man, but she testified that the man was not the person with the pit bull.
 {¶ 11} Sherrie Cooper was appellant's girlfriend and testified as follows for appellee. Appellant lived with Cooper at her apartment in December 2006. The apartment was part of four townhouses. On the night of December 23, 2006, Cooper was socializing at Stacie Butcher's apartment. She walked home around 10:30 or 10:45 p.m. About 20 minutes later, Butcher called to say the police had been to her apartment to look for appellant in connection with a robbery. Appellant and a man with a pit bull arrived about five minutes later. The man with the pit bull passed through the apartment. Appellant was wearing a dark coat, T-shirt, jeans, and tennis shoes. Appellant was also wearing a black rag on his head. Cooper could not remember the *Page 6 
color of the coat's lining. Appellant kept his clothes in Cooper's basement, and appellant went to the basement to change. Cooper followed. Money fell from the pockets of appellant's jeans, and appellant transferred the money to the jeans into which he changed. Appellant would not tell Cooper what was happening, and he left the apartment.
 {¶ 12} Cooper returned to Butcher's apartment. About a half hour later, the police arrived and drove Cooper back to her apartment. She told the police that she did not see appellant with a gun that night, though she had previously seen him with one. She told the police that appellant sometimes hid a gun in the backyard, though she did not know exactly where. She allowed the police to search her backyard. Cooper identified a picture of a gun in the window well of her apartment. Cooper had never put a gun in the window well. When appellee's counsel showed her Exhibit 20, the gun, she said that it looked "familiar to the gun [she] had seen [appellant] with before." (Vol. II Tr. 124.)
 {¶ 13} Cooper verified that appellant had tattoos on his hands. On one hand was the number 82 and on the other were the words "`Born ready.'" (Vol. II Tr. 128.) Cooper also testified about three letters that appellant sent her while he was in jail. In a September 2007 letter, appellant offered coached testimony or, in the alternative, urged her not to appear in court. Appellant also offered Cooper money. In an October 2007 letter, appellant expressed disappointment that Cooper might testify. Appellant also said that he would "`shoot [Cooper] a nice little whip,'" which meant that he would get her a car. (Vol. II Tr. 136.) Appellant also said that he would give Butcher money if she *Page 7 
did not testify. Appellant included defense counsel's business card and asked Cooper to call the attorney to tell him that Cooper and Butcher were not going to testify. A December 2007 letter included a copy of Cooper's statement to police. The statement informed police about appellant keeping a gun in her backyard and detailed Cooper's interaction with appellant after the carryout incident. In the December 2007 letter, appellant said that Cooper "`broke the G code.'" (Vol. II Tr. 142.) Cooper interpreted that to mean that she "broke a certain code by" talking to the police. (Vol. II Tr. 142.) Appellant said: "`Fuck all the excuses in the world * * * You going to need them later. I ain't playing no games.'" (Vol. II Tr. 142.) Cooper interpreted this as a threat. Appellant also mentioned "`trapping,'" and Cooper said that this term refers to selling drugs. (Vol. II Tr. 143.)
 {¶ 14} Distelhorst testified as follows for appellee. Around 1:50 a.m. on December 24, 2006, Distelhorst saw appellant, who matched the description of the suspect for the crimes at the carryout. Appellant was walking, and Distelhorst ordered appellant to stop. Appellant stopped after repeated commands. Distelhorst grabbed appellant's hands to put him in handcuffs, but appellant pulled away and swung at the officer. Distelhorst punched appellant. Appellant struggled with the officer and the dog that assisted the officer. Distelhorst threw appellant to the ground, and the struggle continued until additional officers arrived. Distelhorst broke the ring finger of his right hand while he struggled with appellant. Distelhorst thought that he injured his finger when he punched appellant or when they fell. During the struggle, appellant "was swinging, and if he did connect, he got [Distelhorst] in the vest, so it didn't have any *Page 8 
effect." (Vol. II Tr. 105.) The police searched appellant and found appellant unarmed, but with "a wad" of money, including a $50 bill. (Vol. II Tr. 91.)
 {¶ 15} Columbus Police Officer James Niggemeyer testified that, although rare, he had seen people with hand tattoos. Columbus Police Officer Smith Weir testified as follows. Weir spoke with an officer who responded to a prior altercation at the carryout. Weir learned that the suspect had a gun during that prior altercation and that appellant was that suspect. The trial court admonished the jury that this was admitted only to provide background. Weir took McNeal to the man outside the police car, and McNeal said that his identification was based on appellant's voice.
 {¶ 16} Columbus police officers also established the following at trial. The man with the pit bull was Marquies Mock. Police found the carryout cash drawer in an alley. The police also found checks and $5 in change in the alley. When the police searched appellant, they recovered $344, including one $50 bill. When the police searched Cooper's backyard, they found a black handgun from a window well of her apartment. The gun was identified as Exhibit 20. The gun did not have a laser. One could be mounted if a bracket was screwed on, but there were no marks to indicate that this had been done. Mounting a laser would not obscure the orange mark on the gun.
 {¶ 17} Forensic Scientist Amoreena Clarkson compared appellant's DNA to that found on the gun recovered from the window well and the hat left at the carryout. Clarkson testified that, as to the hat, appellant could not be excluded as a contributor. Clarkson said that, as to the gun, appellant could be excluded as a contributor. Clarkson explained that this finding did not mean that appellant had not touched the *Page 9 
gun. Clarkson testified that people do not always leave DNA on objects and that people can remove their DNA from objects. Clarkson also stated that exposure to the weather alters the amount of DNA left on an object.
 {¶ 18} Appellee's case closed with stipulations. The first was that the recovered gun is operable. The second was that appellant's fingerprints did not match the two fingerprints lifted from the recovered cash drawer.
 {¶ 19} Appellant's defense counsel did not request a Crim. R. 29 motion for acquittal. Appellant testified as follows. Appellant has prior felony convictions for robbery, attempted burglary, and receiving stolen property. Appellant had previously patronized the carryout. Appellant did not commit the crimes against McNeal or the carryout and its staff, however. Appellant once had an altercation next door to the carryout with a woman to whom he loaned money. Appellant never owned a black coat with orange lining. Appellant never owned a gun with a laser. Appellant knew McNeal. Appellant confirmed the tattoos on his hands.
 {¶ 20} As for the evening of December 23, 2006, appellant ran into a man he knew as "Mar" with a dog. (Vol. III Tr. 136.) The man was coming from the direction of the carryout. Appellant was going to Cooper's apartment. Appellant lived with Cooper in December 2006. The man followed him inside Cooper's apartment. Eventually, the man left, and appellant went to the basement to change his pants because they were "really dirty from gambling, shooting dice." (Vol. III Tr. 141.) Appellant was a successful gambler. Appellant admitted to writing to Cooper from jail, although on cross-examination appellant evaded questions about details of his letters to Cooper. *Page 10 
 {¶ 21} The trial court asked for any additional evidence on the weapons under disability charge, and appellee submitted a judgment entry that previously convicted appellant of robbery, a third-degree felony. The trial court found appellant guilty of having a weapon while under disability. The court concluded that "the circumstantial evidence was clear that you had a gun in the window well." (Vol. IV Tr. 90.) The court stated, "quite apart from whether or not the jury finds you guilty of sticking up [the carryout], I think that your house where you were living with Ms. Cooper — at least part-time living with Ms. Cooper, I believe her testimony and I believe the gun found outside was attributable to you and you violated the law." (Vol. IV Tr. 90-91.)
 {¶ 22} The jury found appellant guilty of the remaining charges and specifications. The trial court dismissed the robbery counts in case No. 08CR05-3704. For case No. 07CR01-100, the trial court merged the robbery counts into the aggravated robbery counts. The trial court sentenced appellant to the following consecutive prison terms totaling 22 years and six months: (1) eight years for the aggravated robbery pertaining to the carryout and staff; (2) seven years for the aggravated robbery against McNeal; (3) 18 months for the assault against Distelhorst; (4) three years for having a weapon while under disability; and (5) three years for the merged firearm specification.
 {¶ 23} The parties agreed that appellant had 577 days of jail-time credit. The trial court did not apply that credit to case No. 07CR01-100. The trial court applied that credit to the sentence it imposed for appellant's community control violation in common pleas case No. 06CR-6084, which is not subject to this appeal. *Page 11 
 {¶ 24} Appellant appeals asserting the following assignments of error:
 First Assignment of Error: The evidence was legally insufficient to identify appellant as the person who committed the robberies charged in counts one through six. Furthermore, conviction on these counts was against the manifest weight of the evidence.
 Second Assignment of Error: The evidence was legally insufficient to establish a separate robbery with respect to Ray McNeal, the alleged victim in counts four, five and six. Furthermore, conviction on these counts was against the manifest weight of the evidence.
 Third Assignment of Error: The evidence was legally insufficient to establish appellant knowingly caused physical harm as alleged in count seven of the indictment. Furthermore, conviction on this count was against the manifest weight of the evidence.
 Fourth Assignment of Error: The evidence was legally insufficient to establish appellant was in possession of a weapon while under disability as alleged in count eight of the indictment. Furthermore, conviction on this count was against the manifest weight of the evidence.
 Fifth Assignment of Error: The trial court erroneously denied appellant jail-time credit for time spent in custody awaiting trial.
 {¶ 25} We address appellant's first and second assignments of error together. In these assignments, appellant challenges his convictions for crimes involving McNeal and the carryout and its staff. Appellant contends that these convictions are based on insufficient evidence. Appellant did not move for a Crim. R. 29(A) acquittal. In State v.Roe (1989), 41 Ohio St.3d 18, 25, the Supreme Court of Ohio held that a defendant forfeits a sufficiency argument on appeal when the defendant fails to move for acquittal at trial. Relying on Roe, we reviewed a sufficiency of the evidence argument under the *Page 12 
plain error standard where a defendant failed to raise a Crim. R. 29 motion at trial. State v. Silguero, 10th Dist. No. 02AP-234, 2002-Ohio-6103, ¶ 6. More recently, however, the Supreme Court held that a defendant did not forfeit a sufficiency of the evidence argument on appeal when he failed to raise a Crim. R. 29 motion at trial. SeeState v. Jones, 91 Ohio St.3d 335, 346, 2001-Ohio-57. We followedJones in State v. McKinney, 10th Dist. No. 08AP-23, 2008-Ohio-6522, ¶ 35-42. In any event, we conclude that this issue is largely academic because a conviction based on legally insufficient evidence constitutes a denial of due process. City of Perrysburg v. Miller,153 Ohio App.3d 665, 2003-Ohio-4221, ¶ 57. "Accordingly, if the evidence is insufficient (regardless of whether we review it under a * * * plain-error standard), the conviction must be reversed." State v. Palmer, 1st Dist. No. C-050750, 2006-Ohio-5456, ¶ 8. As we did in McKinney, we address appellant's insufficiency of the evidence argument without utilizing the plain error standard.
 {¶ 26} Sufficiency of the evidence is a legal standard that tests whether the evidence introduced at trial is legally sufficient to support a verdict. State v. Thompkins, 78 Ohio St.3d 380, 386,1997-Ohio-52. We examine the evidence in the light most favorable to the state and conclude whether any rational trier of fact could have found that the state proved beyond a reasonable doubt the essential elements of the crime. State v. Jenks (1991), 61 Ohio St.3d 259, paragraph two of the syllabus; State v. Yarbrough, 95 Ohio St.3d 227, 2002-Ohio-2126, ¶ 78. We will not disturb the verdict unless we determine that reasonable minds could not arrive at the conclusion reached by the trier of fact. Jenks, at 273. In determining whether a conviction is based on *Page 13 
sufficient evidence, we do not assess whether the evidence is to be believed, but whether, if believed, the evidence against a defendant would support a conviction. See Jenks, paragraph two of the syllabus;Yarbrough, at ¶ 79 (noting that courts do not evaluate witness credibility when reviewing a sufficiency of the evidence claim).
 {¶ 27} We limit our analysis to appellant's aggravated robbery convictions because the trial court merged the robbery offenses into the aggravated robberies. See McKinney, at ¶ 39. Appellant argues that the evidence failed to identify him as the person who committed the aggravated robberies. At trial and during the police investigation, however, Qabie and McNeal identified appellant as the perpetrator. Likewise, before the carryout incident, McNeal heard appellant say that he needed money. In addition, physical evidence connected appellant to the aggravated robberies. Witnesses testified that the offender wore a white hat, and Clarkson testified that appellant "cannot be excluded as a contributor" of DNA on the white hat found at the carryout. (Vol. III Tr. 102.) Appellant also engaged in furtive conduct reflective of a consciousness of guilt. See State v. Hurst (Mar. 7, 2000), 10th Dist. No. 98AP-1549. Appellant changed his clothes after committing the aggravated robberies. In letters from jail, appellant attempted to bribe Cooper to keep her from testifying, and appellant threatened her for cooperating with the police. Therefore, we conclude that sufficient evidence identified appellant as the person who committed the aggravated robberies.
 {¶ 28} Next, appellant argues that the conviction is against the manifest weight of the evidence. In determining whether a verdict is against the manifest weight of the evidence, we sit as a "thirteenth juror." Thompkins, at 387. We review the entire *Page 14 
record, weigh the evidence and all reasonable inferences, and consider the credibility of witnesses. Id. Additionally, we determine "`whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" Id., quotingState v. Martin (1983), 20 Ohio App.3d 172, 175. We reverse a conviction on manifest weight grounds for only the most "`exceptional case in which the evidence weighs heavily against the conviction.'"Thompkins, at 387, quoting Martin, at 175. Moreover, "`it is inappropriate for a reviewing court to interfere with factual findings of the trier of fact * * * unless the reviewing court finds that a reasonable juror could not find the testimony of the witness to be credible.'" State v. Brown, 10th Dist. No. 02AP-11, 2002-Ohio-5345, ¶ 10, quoting State v. Long (Feb. 6, 1997), 10th Dist. No. 96APA04-511.
 {¶ 29} Appellant claims that Qabie did not credibly identify him as the perpetrator. Appellant notes that Qabie based her identification on the offender having hand tattoos, but McNeal did not confirm this. Appellant also indicates that McNeal and Niggemeyer testified to seeing other people with hand tattoos. We find Qabie's identification credible. Qabie recognized the offender's tattoos as the ones she had seen on appellant, i.e., one hand with letters and the other with numbers, and appellant admitted to having these tattoos. Qabie also identified appellant through his voice, and this identification is credible because she was familiar with appellant's voice.
 {¶ 30} Appellant asserts that, although Qabie testified that the robber used a gun with a laser, there was no laser on the gun that the police found. Appellant also *Page 15 
recognizes that physical evidence did not link appellant to the gun that the police found. Regardless, McNeal's testimony connected the gun that the robber used with the gun that the police found; McNeal testified that the robber used a gun with an orange mark, and there was an orange mark on the gun that the police found. Even if these guns are different, McNeal and Backner confirmed Qabie's testimony that the robber used a gun, and appellee was not required to produce the gun to secure an aggravated robbery conviction. State v. Vondenberg (1980),61 Ohio St.2d 285, 289.
 {¶ 31} Appellant contends that his letters to Cooper suggest only his (1) dismay at Cooper's lack of loyalty or (2) fear that she might have provided testimony about his drug activity. Appellant is incorrect. It was within the province of the jury to conclude that the letters' tone and content indicated furtive activity reflective of a consciousness of guilt.
 {¶ 32} Appellant argues that the jury improperly convicted him on Officer Weir's testimony about his involvement in the prior altercation at the carryout. We disagree. The trial court instructed the jury that this testimony was admitted only to provide background, and we presume that the jury followed the instruction. State v. Garner,74 Ohio St.3d 49, 59, 1995-Ohio-168.
 {¶ 33} Appellant claims that the $344 that the police found on him was less than the $2,000 that Qabie estimated was taken. The jury could reasonably conclude that appellant was not found with all the money stolen because the police also found money, the missing checks, and the cash drawer. Likewise, regardless of the amount of money *Page 16 
found on appellant, it was reasonable for the jury to convict him of the aggravated robberies based on the other evidence against him.
 {¶ 34} Appellant argues that his successful gambling explained the amount of money found on him. It was within the jury's province not to reach this conclusion, given the other evidence against appellant. SeeThompkins, at 387; Brown, at ¶ 10. Appellant asserts that the fingerprints on the carryout cash drawer did not match his fingerprints and that there was a discrepancy about whether the offender committed the crimes while wearing a coat with orange lining and a fur-lined hood. These issues do not weigh heavily against appellant's conviction, given the other evidence against him. See Thompkins, at 387.
 {¶ 35} Next, appellant argues that his conviction for aggravated robbery against McNeal is based on insufficient evidence because he did not commit a theft from McNeal. See R.C. 2911.01(A) (indicating that aggravated robbery involves attempting or committing a theft offense). We reject this argument because McNeal testified that appellant stole $50 from him. Appellant claims that this testimony is against the manifest weight of the evidence. Appellant argues that McNeal's prior convictions weigh against his credibility. Appellant also notes McNeal's admission that he "blacked out" during the carryout incident. (Vol. II Tr. 18.) Finally, he asserts that Qabie refuted McNeal's testimony. McNeal testified that he only had a $50 bill and that he had not given it to Qabie when appellant arrived. Qabie testified that McNeal had already given her money when appellant arrived and that McNeal gave her $5. However, it was reasonable for the jury to accept McNeal's testimony because police found a $50 bill on *Page 17 
appellant after the carryout incident. Moreover, Qabie unequivocally testified that appellant "robbed" McNeal. (Vol. I Tr. 38.) Accordingly, we reject appellant's manifest weight argument about the aggravated robbery involving McNeal.
 {¶ 36} In summary, we conclude that appellant's aggravated robbery convictions are based on sufficient evidence and are not against the manifest weight of the evidence. We overrule appellant's first and second assignments of error.
 {¶ 37} In his third assignment of error, appellant argues that his assault conviction is based on insufficient evidence. We disagree.
 {¶ 38} The grand jury indicted appellant for assaulting Officer Distelhorst in violation of R.C. 2903.13(A), which states that "[n]o person shall knowingly cause or attempt to cause physical harm to another." Physical harm includes any injury "regardless of its gravity or duration." R.C. 2901.01(A)(3). Appellant contends that his assault conviction could not have been based on Distelhorst's broken finger because the officer conceded that he might have sustained the injury when he fell or punched appellant. Nevertheless, appellant swung at Distelhorst. The officer was not certain whether appellant struck him, but impact is not required for an assault conviction. See State v.Cossack, 7th Dist. No. 03-MA-263, 2005-Ohio-965, ¶ 82-83; State v.James (June 30, 1982), 12th Dist. No. 81-07-0058. Rather, R.C. 2903.13(A) also prohibits a knowing attempt to cause physical harm. Appellant acknowledges that a person could foresee that swinging at an officer might injure the officer, but appellant contends that foreseeing injury does not equate to knowingly causing injury. "A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably *Page 18 
cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist." R.C. 2901.22(B). Construing appellant's conduct in a light most favorable to appellee demonstrates that appellant acted knowingly, i.e., appellant was aware that his swinging at Distelhorst would probably result in hitting and injuring the officer. Accordingly, we conclude that sufficient evidence supported appellant's assault conviction.
 {¶ 39} Appellant also claims that his assault conviction is against the manifest weight of the evidence. We disagree. Appellant does not support this claim with any argument, and we find no miscarriage of justice for the jury to have accorded weight and credibility to evidence establishing that appellant assaulted Distelhorst. Therefore, we overrule appellant's third assignment of error.
 {¶ 40} In his fourth assignment of error, appellant argues that his having a weapon while under disability conviction is based on insufficient evidence. We disagree.
 {¶ 41} R.C. 2923.13(A)(2) prohibits having a weapon while under disability and states that no person with a conviction for a felony offense of violence shall "knowingly acquire, have, carry, or use any firearm" unless relieved from the disability. Appellant argues that the evidence did not establish that he had a firearm. In order to "have" a firearm under R.C. 2923.13, one must either actually or constructively possess it. State v. Dorsey, 10th Dist. No. 04AP-737, 2005-Ohio-2334, ¶ 32. Constructive possession exists when a defendant knowingly has the power and intention at any given time to exercise dominion and control over a firearm, either directly or through others. Id. *Page 19 
Constructive possession exists even though the object is not in the person's immediate physical possession. State v. Wolery (1976),46 Ohio St.2d 316, 329.
 {¶ 42} The trial court convicted appellant for possessing the gun that the police found in the window well of Cooper's apartment. Construing the evidence in appellee's favor establishes that appellant constructively possessed this gun. Cooper testified that appellant usually hid a gun in the backyard. Cooper said that she did not place the gun in the window well and that the gun looked "familiar to the gun [she] had seen [appellant] with before." (Vol. II Tr. 124.) Moreover, because appellant lived at Cooper's apartment, he had power and intention at any given time to exercise dominion and control over the gun found in the window well. Accordingly, we conclude that appellant's having a weapon while under disability conviction is based on sufficient evidence.
 {¶ 43} Appellant argues that this conviction is against the manifest weight of the evidence. Appellant notes that the gun did not contain his DNA. However, this does not weigh against his conviction. Clarkson testified that the gun not having appellant's DNA did not mean that he "never touched the gun." (Vol. III Tr. 103.) Clarkson explained that people do not always leave DNA on objects and that people can remove their DNA from objects. Additionally, the gun found in the window well was exposed to the weather, and Clarkson testified that exposure to the weather alters the amount of DNA left on an object.
 {¶ 44} Appellant suggests that other tenants of Cooper's apartment complex could have placed the gun in the window well. Nevertheless, it was reasonable for the *Page 20 
trial court to have concluded that appellant constructively possessed this gun because he lived with Cooper, and Cooper indicated that he kept a gun in the backyard.
 {¶ 45} Lastly, appellant asserts that Qabie testified that appellant committed the crimes at the carryout with a gun that had a laser. Appellant indicates that there was no laser on the gun that the police found in the window well and that the gun did not have markings to indicate that a laser had ever been mounted. McNeal's testimony, however, connected the gun that appellant used at the carryout with the gun that the police found in the window well. In any event, the trial court did not base its decision on the gun used at the carryout, but on the gun found in the window well, and the evidence established that appellant constructively possessed the gun found in the window well.
 {¶ 46} Accordingly, we conclude that appellant's having a weapon while under disability conviction is not against the manifest weight of the evidence. Having also concluded that this conviction is not based on insufficient evidence, we overrule appellant's fourth assignment of error.
 {¶ 47} In his fifth assignment of error, appellant argues that the trial court miscalculated his jail-time credit by two days. An appellant has the duty on appeal to show error in jail-time credit. State v.Hunter, 10th Dist. No. 08AP-183, 2008-Ohio-6962, ¶ 17. Appellant forfeited all but plain error because he failed to raise the issue in the trial court. Id. at ¶ 16-17. Plain error exists when there is error, the error is an obvious defect in the trial proceedings, and the error affects substantial rights, i.e., affects the outcome of the trial.State v. Barnes, 94 Ohio St.3d 21, 27, 2002-Ohio-68. A *Page 21 
court recognizes plain error with the utmost caution, under exceptional circumstances, and only to prevent a manifest miscarriage of justice. Id.
 {¶ 48} Appellant disputes the trial court's calculation of jail-time credit that had accrued by the time of the sentencing hearing. The defense expressly agreed to this calculation at sentencing, however. In any event, any jail-time credit miscalculation here does not create a manifest miscarriage of justice necessitating a remand for plain error. Whether the actual time was 577 days or 579 days, the trial court's express intention was to apply all of the time to the community control violation as the full sentence for that violation.
 {¶ 49} Next, appellant argues that the trial court was required to apply to case No. 07CR01-100 the jail-time credit that accrued by the time of sentencing. Appellant argues that the sentence on this case was effectively concurrent to the community control violation sentence. InState v. Fugate, 117 Ohio St.3d 261, 2008-Ohio-856, ¶ 1, 22, the Supreme Court of Ohio held that jail-time credit must be applied toward each concurrent prison term, but against only one of the consecutive sentences. Id. at ¶ 22. The way that the trial court crafted the community control sentence resulted in appellant having already served that sentence by the time of the sentencing hearing. State v.Speakman, 10th Dist. No. 08AP-456, 2009-Ohio-1184, ¶ 13. Thus, the trial court did not impose the community control violation sentence concurrent with the sentence in case No. 07CR01-100. Id. Therefore, we find no error, let alone plain error, when the trial court declined to apply to case No. 07CR01-100 the jail-time credit that accrued at the *Page 22 
time of sentencing. See Speakman, at ¶ 13; Fugate, at ¶ 22. Consequently, we overrule appellant's fifth assignment of error.
 {¶ 50} In summary, we overrule appellant's five assignments of error. Thus, we affirm the judgments of the Franklin County Court of Common Pleas.
Judgments affirmed.
KLATT and SADLER, JJ., concur. *Page 1